> susceptible of being established by proof to that degree of certainty which the law demands. (citations omitted).

. . . .

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

. . . .

> The businesses in the former cases actually operated at a profit, albeit for a short time; Teletron never did. Teletron's expectations were at best hopeful; in reality, they were little more than wishful.
> Teletron strenuously argues that even TI thought its projections were reasonable. The fact that TI shared Teletron's hopes adds no substance to them.

<u>Texas Instruments, Inc. v. Teletron Energy Management, Inc.</u>, 877 S.W.2d 276 (Tex. 1994).

The source of the financial information which forms the basis of Musika's opinions on the value of BNE's intangible assets and of damage to BNE due to their loss is the Monitor Clipper document. Musika testified on direct as follows:

Q    Let's go to your second reference point. Can you frame that for us please, sir?

A    Yes. In the second reference point I speak specifically and directly to the anticipated cash flow that BNE at the time contemplated as did Earth/Color in the document that has been marked as Plaintiff's Exhibit 79. So basically I went directly to the projections that were prepared by Earth/Color and negotiated and reviewed with BNE. I looked directly to those and identified the cash flow that was identified at the time and then valued that cash flow by actually conservatively bringing it back to 2003 on a present value basis.

. . . .

A    ... the damage amount associated with the second reference point and that is $1,859,011 and that is reflected on my Exhibit K.

Q    Okay.

A    If we go back from there now to where your question, pending question was: What did I use from Exhibit 79 to get to that 1.8-million? I used what is reflected on Exhibit G–I'm sorry not G–Exhibit E.

Q    Okay.

A    So if we'd turn to Exhibit E, Exhibit E is my schedule but it is an exact reprint of what's contained in Plaintiff's Exhibit 79.

Q    Okay. And let's do that. Looking at Exhibit E going down to "Operating Income" –
A.   Yes.

Q    Okay. If you look at that number and everything above it did you get all of that information from Exhibit 79?

A.   I did. And specifically that would be MCP00062. I basically copied what was on that document and put it on my Exhibit E down to "Operating Income".

Q    Okay.

A    I need to point out one thing, if I may?

Q    Yes, please do so.

A    The numbers, the detailed numbers are the same but I noticed in so doing it that there was a math error in the Plaintiff's – I'm sorry – in the defendants' document, so I corrected the math error, therefore, my numbers – the final "Operating Income" numbers are slightly lower on Exhibit E versus what's on MCP00062. I think it's just a rounding problem, but I've been more conservative. I've corrected for the math and used a lower operating income.

Q.   Okay. And so in terms of your analysis and where it begins on reference point two the operating income numbers at MCP62 of Exhibit 79 are – except for any mathematical issues are the same as the operating income on your Exhibit E to your report; is that correct?

A    Yes.

Q    Okay.

A    Just for point of reference if you looked at MCP00062 and looked at the bottom line, "Operating Income" for example in 2003 it says, "Zero" and in my "Operating Income" there I say, "$100,000." In the next one it says on the defendants' document, "800,000". I say, "600,000." The next "1.2-million" they say; I say, "900,000" so you can see they're slightly different. If you looked at the detailed numbers up above you'd see that they were the same. Once again, I think they've got a math error.

Q    Okay. Now – so now we know where you get the operating income in you Exhibit E; what did you do next for reference point two to get to the 1.859 - million?

A I carried that cash flow that defendants had specifically expected, anticipated and prepared in their Exhibit 79 and I carried it over to Exhibit K of my report. So the top line of Exhibit K is just the exact same line from what was Exhibit E.

. . . .

Q Now focusing on Exhibit K tell the Court and counsel what you did with those numbers that effectively have come indirectly out of Exhibit 79.

A Repeating again that those numbers that come directly out of 79 are the anticipated cash flow and what I did next was to divide that cash flow that's on Exhibit K into two groups. One group would be revenue associated with prior BNE customers or anticipated BNE customers – that's the first line underneath – and then the second line would be the difference would be non-BNE associated customers . . .

. . . .

A . . . I've divided the total cash flow into these two groups – that being BNE-related and non-BNE related.

. . . .

A having reduced the overall cash flow amount now for this component we've just discussed, the next thing I did was to take these anticipated future dollars and bring them back to a basis that would value it as of the date of the transfer that being as of 2003 . . .

. . . .

Q If you turn to Exhibit I of your report can you tell us whether or not that part of your report reflects this analysis that you conducted?

A Well, it's exactly the same as Exhibit K . . .

Q Okay, sir. And with regard to that reference point which number – or what number do you arrive at?

A I then discount this cash flow which now has the premium margin in it. I discount it in exactly the same way and I come to a value of $4,003,417.

(Docket no. 117, transcript, direct examination, Terry Musika, July 12, 2006, p. 31, l. 23 - p. 43, l. 15.)

  Musika then explains that he "weighted" the figures he had derived to conclude that BNE incurred damages of $3,100,000. On cross-examination, Musika testified as follows:

Q    Let's take the sales orders to start with. Your opinion of the value of the sales orders is based on an analysis that you did about what profit you thought they might generate; is that correct?

A    Yes.

Q    And, similarly, with respect to the goodwill and other intangibles, your opinion as to value is based on an analysis of what you think the profit that they could have generated is; is that correct?

A    The discounted cash flow, which in some ways relates to profit, yes.

Q    Okay. Now, I'd like to focus in on the six pre-petition work orders for the moment. See if I understand this correctly. Let's turn to Exhibit C, for a second, of your report, if we could. Now I think you said this morning – I would just like to confirm. Am I correct in understanding that your analysis here is very straightforward – you take the total invoice price of each of these work orders and you've multiplied it by 27.2 percent; is that correct?

A    Yes.

Q    Okay. And that 27.2 percent is based on some incremental profit numbers that you've derived from the Monitor Clipper presentation that we talked about this morning that was given to Earth/Color's banks; is that correct?

A    . . . Right, I'll go with it.

. . . .

Q    . . . the conclusion of your analysis is that these six jobs could have been done on an outsourcing basis . . . by BNE for the profit amount you indicated; is that correct?

A    Yes, that's correct.

Q    And, now, you said this morning, didn't you sir, that it was your opinion that the 27.2 percent profit was reasonable; is that correct?

. . . .

A    Yes.

Q    Is it your opinion that that's what the actual profit on those jobs was, sir?

A    I don't believe that Earth/Color has ever disclosed what the actual profit is . . .

. . . .

Q    So let me understand this correctly. . . . The thing we're talking about being transferred, sir, am I correct, is those six work orders at the price BNE would have charged for those jobs; is that correct sir?

A    Not necessarily, no.

. . . .

Q    What do you think BNE would have charged for those jobs at that time?

A    The amounts that are reflected on the sales orders.

. . . .

Q    Okay. Now hypothetically, if the evidence showed that, in fact, the price that was invoiced here was $30,000 below the cost that it took Earth/Color to produce this job, would that affect your opinion of the value of the job, sir?

A    No.

. . . .

A    BNE would charge, as the broker – as an outsourcing broker for this work, the amounts that are on this invoice . . .

. . . .

Q    Did you look at what Earth/Color or someone like that would have charged for such a job?

A    No, I don't know how that would be done.

. . . .

Q    And I'm saying sir, if, hypothetically, the market price to get this job done on an outsourcing basis was a hundred and thirty-eight thousand dollars, how valuable would this job have been to BNE on an outsourcing basis?

A    It would be what the market would dictate and what their arrangement between the parties established would be the profitability to them. . . .the fact that Earth/Color may lose money . . . that doesn't mean they're not going to have to pay market rates to the broker and that the broker isn't going to make money.

. . . .

Q    But you said, sir, that the brokerage margin was 10 percent; is that correct, sir?

A    No, I said that that was an increase that the parties agreed to, that they would – they would and could charge on the work that would be a part of the joint relationship between BNE and Earth/Color.

. . . .

Q   Sir, does your report determine – and opinion determine what a hypothetical willing buyer would have paid for the goodwill and other intangibles?

A   It may have but that was not the objective, as I stated. So I can't say that I undertook that analysis to determine that or not.

. . . .

Q   Okay. I'd like now to turn to the last two data points, if I could, sir, the 1.86 and the 4 million.

A   Yes.

Q   Now, I think you said before, if I understood correctly, that these are based on discounted present value of cash flows; is that correct?

A   That's correct.

Q   Okay. And based on your weightings of 30 percent and 60 percent, these are the principal things that led you to the conclusion of what you said was, Value of the goodwill and other intangibles of 3.1 million"; is that right, sir?

A   Yes.

. . . .

Q   Right. Now, the joint venture, which is what you said you were valuing at the time?

A   The cash flow produced from the joint venture that was expected by BNE, its share of the joint venture cash flow.

. . . .

Q   Okay. All right. Now I think I'd like to turn to the projections that you used, okay?

A   Okay.

Q   And, again, I want to kind of talk about both data point two and data point three kind of together. Am I correct, sir; they're based on the same set of projections that came out of the Monitor Clipper document; is that correct?

A   That's a correct statement.

. . . .

Q   Hypothetically, sir, if Nicholas/Earth is having sales in the first half of 2006 that are 50 percent below that projection, would that lower your opinion of value?

A    No.

Q    And I take it, sir, that's because the actual performance does not affect your opinion of value; is that correct?

A    The value is based on the expected cash flow that would accrue to and come to BNE taken at the time of 2003.

. . . .

Q    I thought you said, sir, you weren't valuing BNE. You were valuing the joint venture and that your opinion was as to the joint venture and not BNE?

A    That's absolutely wrong.

Q    Am I correct, sir?

A    That absolutely misstates my testimony. What I said I was valuing was the future cash flow that the joint venture would produce and provide to BNE but for the actions on behalf of the Defendant.

. . . .

Q    And do you know whether the projections, that we were just talking about, assume that most of that work was going to be sheet-fed or web based?

A    At the time that I performed my valuation, I did not know and didn't have any – didn't prepare any analysis regarding that.

Q    Now, if hypothetically, the projections assume that it was all going to be sheet-fed business, when in fact it turned out to be mostly web-printing business; would that affect your opinion of value?

A    No.

Q    Okay. now you said – you've been saying you valued the cash flows of the joint venture; is that right?

A    Anticipated cash flows, yes.

Q    And used that value for your value of goodwill and other intangibles; is that correct?

A    Yes, that's correct.

Q    Now, did you subtract the value of any tangible assets at all from the valuation of the joint venture?

A    No.

Q    Would it be appropriate to deduct that value?

A    If there were any.

. . . .

Q    You see that? Do you know what the new sales represent sir?

A    My understanding is those are sales that are going to be performed, by and large, as part of the new joint venture or by the new joint venture and not outsourced to Earth/Color.

Q    So that would mean that they would be produced on the joint venture's own printing equipment; is that right, sir?

A    That's what was contemplated, I believe. Yes.

Q    Okay. And do you know how many printers the joint venture had or has currently?

A    Has currently? No, I don't.

Q    Do you know sir, how many sheet-fed printers it would take to produce the amount of new sales that are in this?

A    No. I mean I – no.

Q    So you didn't analyze at all how many tangible assets this would take?

A    No.

. . . .

Q    Well, sir, I thought you were saying that the premise was that they could have – BNE could have continued and done all this work on an outsourcing basis; is that correct?

A    No, that's not the premise of the valuation. No, that is not what I said at all. . . . The basis of the valuation is entering into the joint venture, as was contemplated; not as a brokering arrangement.

Q    So its's really the value of the potential joint venture interest that you were valuating?

A I think I've said that all along.

(Docket no. 117, transcript, cross-examination, Terry Musika, July 12, 2006, p. 54, l. 4 - p. 131, l. 17.)

  All of the projections contained in the Monitor Clipper document are based solely on historical financial information about Earth Color pre-dating the existence of the joint venture and Earth Color's investment in or loan to the joint venture. Although the document notes that BNE has struggled with little cash and is deeply in debt, it contains no historical or projected financial data about BNE. The document contains no actual financial data about the proposed joint venture as of the date of its creation or thereafter.

  The financial projections contained in the document are based on the assumption that Earth Color will loan substantial operating cash to the venture, the joint venture will out-source sheet-fed work to Earth Color, and Earth Color will exploit its existing work force and equipment performing the sheet-fed work. The projections contained in the document as they pertain to the joint venture are hypothetical. Therefore, while the document may have been sufficient to satisfy bankers concerning the potential profitability of the proposed joint venture from Earth Color's perspective, it contains no factual information useful to a calculation of lost net profits of BNE resulting from the transfer of the six purchase orders to ECH or to a calculation of the value of BNE's good will or other intangible assets allegedly transferred to or "co-opted" by the defendants. Prospective profits, which are too speculative for recovery otherwise, cannot be recovered by capitalizing them and calling them good will. Sherwin-Williams Co. v. Perry Co., 424 S.W.2d 940 (Tex.Civ.App., Austin 1968, writ ref'd n. r. e.).

As all of Terry Musika's calculations were based on the numbers contained in the Monitor Clipper document, his calculations and his opinions are not useful to the Court because they do not show lost profits or the value of the corporate intangibles with reasonable certainty based on objective facts, figures, or data. In fact, even had the financial data in the Monitor Clipper document been actual data concerning BNE or the joint venture as it operated, Musika did not subtract the value of the tangible assets necessary to produce the cash flows and goodwill from his figures, a calculation which he agrees would be appropriate in calculating goodwill.

The data underlying Musika's calculations is speculative and pertinent only to showing in general terms that an investment in the proposed new business might be profitable to Earth Color if the new business performs in accordance with the assumptions underlying the document. The evidence at trial showed, however, that the new business did not perform in accordance with the assumptions underlying the Monitor Clipper document. The new business did not actually generate the amount of sheet-fed work underlying the projections in the document. Consequently, Earth Color was not able to utilize its existing equipment in the manner projected. Instead of meeting the projections based on the assumptions underlying the document, the new business lost money until Sprint and Verizon became clients and Earth Color acquired web-based printing presses at a cost of $6 million. The Monitor Clipper document does not include projections based on the acquisition of additional web-based printing equipment. Musika testified that his calculation of damages based on the projections contained in the Monitor Clipper document would not differ if the actual performance of the new company differed from the projections. In Musika's view, the Monitor Clipper document is an enforceable agreement requiring Earth Color to pay the profit percentages shown in the document. The Monitor Clipper document is not, however, a contract subjecting Earth

Color to pay the new company the amounts shown therein and Musika's failure to take into account the actual performance of the new company renders his calculations unusable in this case.

### III. Conclusion

The Court finds that the trustee has failed to prove: (1) that any assets of the debtor were transferred; (2) that debtor had acquired rights in any assets allegedly transferred; (3) that debtor received less than reasonably equivalent value for any transfer; (4) that anyone acted with actual intent to hinder, delay, or defraud any creditor of BNE; or (5) that transfers were made at a time when debtor was engaged in business or about to engage in business for which its remaining assets were unreasonably small, as the Court finds that BNE closed business at the end of April 2003 before any of the alleged transfers took place.

The Court concludes that the trustee has failed to prove the fraudulent transfer or the unauthorized post-petition transfer of any asset of BNE. As liability of a transferee under 11 U.S.C. § 550 is predicated upon avoidance of a transfer under §§ 548 or 549, the Court finds that the trustee has failed to prove a cause of action under 11 U.S.C. § 550.

Signed this 10 day of January, 2007 at Houston, Texas.

KAREN K. BROWN
CHIEF UNITED STATES BANKRUPTCY JUDGE